# EXHIBIT A-1

COMMONWEALTH OF MASSACHUSETTS

| | |
|---|---|
| SUFFOLK, ss. | SUPERIOR COURT DEPARTMENT<br>BUSINESS LITIGATION SESSION |

RUE GILT GROUPE, INC.  )
           )
    Plaintiff, )
           )
v.         )  Civil Action No.
           )
ZURICH AMERICAN INSURANCE )
COMPANY,      )  *3/11/2022*
           )
    Defendant. )

## **COMPLAINT**

1. In this action, Plaintiff Rue Gilt Groupe, Inc. (formerly known as RueLaLa, Inc.) ("RGG") seeks declarations from this Court that defendant, Zurich American Insurance Company ("Zurich") is required to cover RGG against business income and extra expense losses caused by the COVID-19 pandemic under an "all risks" insurance policy, Policy No. ERP9487386-08 (the "Policy"). RGG also seeks monetary damages for Zurich's breach of contract.

2. Zurich refuses to honor its contractual obligations despite agreeing to cover RGG for business interruption and extra expense losses resulting from physical loss or damage either at RGG's insured locations, or within five miles of those locations. Zurich denies that COVID-19 or related orders constitutes or resulted in insured physical loss or damage to property, and that coverage is otherwise barred by at least one exclusion to coverage. Zurich is wrong, as emerging medical and scientific studies confirm that COVID-19 results in tangible physical transformation of the air and surfaces, rendering dangerous transmission vehicles and making the

property unsafe, unfit, and uninhabitable for ordinary functional use.  Thus COVID-19 and related orders aimed at curbing its introduction or reintroduction onto property constitute and result in physical loss or damage to property.

## THE PARTIES

3.RGG is incorporated under the laws of Delaware, with its principal place of business in Boston, Massachusetts.

4.Zurich is incorporated under the laws of the State of New York, with its principal place of business in Schaumburg, Illinois.

## JURISDICTION AND VENUE

5.Jurisdiction is proper pursuant to G.L. c. 223A §§ 2 and 3 inasmuch as (i) the headquarters and principal place of business of RGG is in Massachusetts; (ii) Zurich is licensed to do, and has in fact conducted and currently conducts, business in Massachusetts; and (iii) performance under the Policy is sought in this jurisdiction.

6.Venue is proper in the Business Litigation Session of the Superior Court because this case involves a complex insurance dispute, involving over $15,000,000 in business income and extra expense losses, RGG's operations are located a short distance from this Court and within the reach of the Business Litigation Session, and the events giving rise to RGG's claim took place in part in this County, including communications between RGG and Zurich concerning the losses covered under the Policy.

## FACTUAL BACKGROUND

7.RGG is an online shopping retailer headquartered in Boston, Massachusetts, with additional office locations in New York, New York and Louisville, Kentucky and with a distribution center in Shepherdsville, Kentucky.

8.      On March 13, 2020, RGG was forced to close its covered office locations following the outbreak of the COVID-19 pandemic in order to avoid harm to its sales associates and physical loss or damage to its property.

## THE POLICY

9.      The Policy "insures against direct physical loss of or damage caused by a Covered Cause of Loss to Covered Property, at an Insured Location." A Covered Cause of Loss is defined as "[a]ll risks of direct physical loss of or damage from any cause unless excluded." Covered Property includes RGG's "interest in buildings (or structures) including new construction, additions, alterations, and repairs that the Insured owns, occupies, leases or rents."

10.     RGG seeks declarations of insurance coverage for loss or damage resulting from the actual presence or risk of COVID-19 at covered locations and within five miles of those locations resulting in the issuance of civil authority orders that fully or partially limited access and normal business operations at the locations identified in Paragraph 6. RGG also seeks declarations that it is entitled to recover its extra expense, as that term is used in the Policy.

11.     The Policy provides a wide range of coverages, with Zurich agreeing to a combined maximum coverage limit of $125,000,000 per occurrence.

12.     The Policy provides two overarching types of coverage to RGG: (i) "Property Damage" coverage, and (ii) "Time Element" coverage.

13.     "Time Element" is coverage for business interruption and related losses sustained by RGG resulting from the inability to put damaged property to its normal use, *e.g.*, the condition of property that would have existed in the absence of physical loss or damage.

14.     Two basic types of "Time Element" coverage are at issue here: (i) coverage that indemnifies RGG for lost income and extra expense because of physical loss or damage to its

covered locations, and (ii) coverage that indemnifies RGG for lost income and extra expense because of physical loss or damage to third-party property within five miles of RGG's covered locations. There are several different types of "Time Element" coverage at issue in RGG's claim, none of which are mutually exclusive. Some, however, have sub-limited amounts available to RGG in addition to other coverages.

15. The basic Time Element coverages provide coverage for loss of "Gross Earnings" or "Gross Profits." There also is "Leasehold Interest" coverage for the "loss incurred by the Insured (as lessee) resulting from direct physical loss of or damage caused by a Covered Cause of Loss to a building (or structure) which is leased and not owned by the Insured." There also is "Tenants Prohibited Access" coverage for the actual Gross Earnings or Gross Profit loss sustained, resulting from "the necessary Suspension of the Insured's business activities at an Insured Location if access to that Location by the Insured's suppliers, customers or employees is physically obstructed due to the owner, landlord or a legal representative of the building owner or landlord, prohibiting access to the Insured Location."

16. Additional "Time Element" coverages at issue in this case include "Civil or Military Authority" coverage, and "Ingress/Egress" coverage.

17. The Policy provides "Civil or Military Authority" coverage for "the actual Time Element loss sustained by the Insured, as provided by this Policy, resulting from the necessary Suspension of the Insured's business activities at an Insured Location if the Suspension is caused by order of civil or military authority that prohibits access to the Location. That order must result from a civil authority's response to direct physical loss of or damage caused by a Covered Cause of Loss to property not owned, occupied, leased or rented by the Insured or insured under

this Policy and located within the distance of the Insured's Location as stated in the Declarations." The Policy declarations state that this distance is 5 miles.

18. The Policy provides "Ingress/Egress" coverage for the "actual Time Element loss sustained by the Insured, as provided by this Policy, resulting from the necessary Suspension of the Insured's business activities at an Insured Location if ingress or egress to that Insured Location by the Insured's suppliers, customers or employees is prevented by physical obstruction due to direct physical loss of or damage caused by a Covered Cause of Loss to property not owned, occupied, leased or rented by the Insured or insured under this Policy." The Policy declarations state that this distance is 1 mile.

## COVID-19

19. COVID-19 is a deadly communicable disease that damages property by physically altering the air and surfaces on which it attaches and transforming such air and surfaces into dangerous and potentially deadly vectors of communicable disease, causing property to become unsafe and unusable.

20. The SARS-CoV-2 virus causes the severe respiratory disease known as COVID-19, which is highly communicable from person to person by direct or indirect contact with an infected individual or an infected individual's discharges. "COVID-19" is not a virus but rather the name of the disease caused by the virus – the 2019 novel coronavirus or SARS-CoV-2.

21. Infected people shed large amounts of SARS-CoV-2 into the physical environment around them. Small particle aerosols can remain suspended in the air for prolonged periods of time, where they can travel distances greater than 6 feet and eventually settle on physical surfaces to become infectious objects called "fomites." Consequently, SARS-CoV-2 transforms property from a safe condition into a dangerous condition. It also changes the quality

of the air into which it is released.  The presence of the COVID-19 communicable disease at a property therefore is an external, physical force that damages property and is a non-excluded peril against which the Policy protects RGG from resulting financial loss.

22. SARS-CoV-2 shed by people with COVID-19 can remain infectious in both aerosols and on many different types of surfaces, and in some cases can remain infectious for weeks depending on ambient temperature and humidity conditions in the environment. Furthermore, the presence of proteins, which are ubiquitous in the environment and in respiratory and skin secretions, significantly prolongs the length of time in which fomites can be transmitted.

23. Exhaled respiratory particles present a significant transmission risk even after they have settled onto surfaces.  Thus, SARS-CoV-2 in the air as shed by COVID-infected persons can cause substantial property damage to the shared air within a property and to the physical property itself.  The current evidence shows that infectious SARS-CoV-2 can remain in the air and on surfaces and pose a significant exposure risk on damaged property even if infected individuals are no longer present.  Further, the air and the surfaces of indoor work environments, including floors, doors, doorhandles, elevator buttons, handrails, machinery, equipment, computers, keyboards, computer mouses and accessories, documents, and other physical items and surfaces, can be damaged by the presence of people with COVID-19.

24. A study released in January 2021 called "Surface interactions and viability of coronaviruses" states that:

> "[i]t has recently been found that surface contamination is very important in terms of transmission of SARS-CoV-2.  Continuous recontamination with contaminated environmental surfaces transfers the infectious virus between humans.  Evaluation of the adhesion mechanisms of SARS-CoV-2 on different inanimate surfaces is crucial for preventing deposition and designing removal

> methods. The physico-chemical adherence and the persistence of SARS-CoV-2 differ with the characteristics of the inanimate surfaces and the virus outer surface proteins, as well as on the surrounding environmental conditions, such as air temperature, relative humidity (RH) and sunlight . . . .
>
> Survival of the virus on non-porous material surfaces (e.g. stainless steel, plastic, latex and glass) was found to be higher than those on porous material surfaces (e.g. paper and cotton)."[1]

Workspaces, including those at RGG's covered locations, contain many non-porous material surfaces that are particularly hospitable to the persistence of SARS-CoV-2 shed by persons affected with COVID-19.

25. Studies addressing the interaction between spike proteins and ambient airborne particulate matter and common property surfaces, such as metals, wood, plastics, fabrics, and glass, demonstrate that COVID-19 causes a tangible, measurable, and physical change or alteration in property.

26. As a further example, scientific and medical studies have confirmed that it physically alters property in several ways: (i) COVID-19 discharges alters physical surfaces and can remain viable on common surfaces such as glass, stainless steel, and money for a month; (ii) COVID-19 can be transmitted through these objects in a process known as "fomite transmission", as noted above; and (iii) infected persons can generate disease-laden aerosols that remain in the air or on surfaces after the infected person has left the area and can infect others, thereby leaving the air and internal spaces of buildings, as well as surface areas and physical objects, physically unsafe and not capable of being used.

27. Many businesses, like RGG, have had to physically reconfigure their layout and install physical safety features, such as ingress/egress signs, sanitizing stations, temperature

---

[1] https://royalsocietypublishing.org/doi/10.1098/rsif.2020.0798

7

check stations, and other property modifications, in order to mitigate communicable disease spread and in an effort to restore the use of physical premises to the condition it was before the loss.

28. The physical effects of COVID-19 are not something that one can determine by glancing at a door handle or a light switch and deciding that it looks undamaged. Instead, those physical effects are established through factual and expert investigation, studies, and evidence, including through testimony by experts in the field of, for example, epidemiology, virology, and transmissible diseases (to establish presence through quantification, contact tracing, and other testing) and industrial hygiene (to establish that once present COVID-19 propagates through the property in the form of discharges, requiring testing, removal, repair, replacement, reconfiguration and remodeling of property and other restoration activities).

29. The damage to property caused by persons with COVID-19 is not limited to the duration that infection from a single source remains present. A recurrent cycle of infection via the indoor air, infectious surfaces, and contact between an infected person and others will further damage property, thus resulting in sustained property damage. As a result, COVID-19 is continually reintroduced onto property, despite best efforts to prevent or otherwise address the physical loss or damage it causes.

30. Any occupation of workspaces in areas of high community transmission has resulted, and is likely to result in, property damage due to the probability that an infected person will enter the premises. Many civil authorities issued shutdown or shelter-in-place orders, in part, because of COVID-19 was causing or had the risk of causing physical loss or damage to property in their local communities.

31. As a general matter, governmental authorities took actions in response to the loss or damage to property caused by the COVID-19 pandemic that limited, restricted, or prohibited partial or total access to RGG's covered locations. These actions included, without limitation:

- Orders restricting or prohibiting travel both internationally and within national borders;

- Quarantine orders applicable to individuals that have COVID-19, whether or not symptomatic;

- Orders closing or limiting business facilities confirmed to have experienced the actual presence of confirmed cases of COVID-19 at their premises;

- Orders closing businesses or limiting access at locations without the confirmed or suspected presence of cases of COVID-19 at their premises, based on their geographic proximity to places where cases of COVID-19 occurred.

32. Such orders also resulted in RGG's suspension of its insured office locations, which had become physically nonfunctional and inaccessible for the conduct of RGG's normal business operations due to the actual presence or risk of COVID-19 communicable disease on the properties.

33. RGG submitted a notice of loss to Zurich on April 10, 2020.

34. Zurich denied coverage on November 3, 2020 because "[t]he presence of the COVID-19 virus does not constitute 'direct physical loss or damage' to property" and because "[t]he presence of the COVID-19 virus falls within the definition of contamination . . . and would be excluded under the Policy."

9

35. The November 3, 2020 denial letter raised other "exclusions" as being potentially applicable to RGG's claim.

36. Zurich's coverage denials are incorrect. Actual controversies therefore exist between RGG and Zurich concerning RGG's rights under the Policy in connection with its COVID-19 business income losses and extra expenses. Declarations from the Court are therefore necessary and appropriate at this time to settle the actual controversies between the parties and enable RGG to ascertain its rights under the Policy.

## COUNT I
### (Declaratory Relief – Direct Physical Loss of or Damage to Property)

37. RGG repeats and realleges the allegations in the preceding paragraphs.

38. RGG's claim is based on the presence or risk of presence of communicable disease at property, and not the presence of the "COVID-19 virus" at property.

39. The presence of the COVID-19 communicable disease at property damages property is discussed in Paragraphs 18 through 29 above. It therefore constitutes "direct physical loss of or damage" to property necessary to trigger coverage under the Policy.

40. The "direct physical loss of or damage" to property caused by the COVID-19 communicable disease resulted in (i) necessary material physical alterations to RGG's insured locations, operations and systems, (ii) the imposition of physical occupancy restrictions at RGG's insured locations, and (iii) the required full or partial physical closure of RGG's insured office locations described in Paragraph 6. These closures caused insured office locations to become physically nonfunctional and inaccessible for the conduct of RGG's normal business operations or otherwise limited these operations.

41. RGG has incurred business income loss due to the presence or risk of COVID-19 communicable disease at property, including but not limited to lost sales, inventory depreciation and increased costs due to the presence or risk of COVID-19 communicable disease at property.

42. RGG has incurred extra expenses loss due to the presence or risk of the COVID-19 communicable disease at property, including (i) the purchase of personal protective equipment, sanitizer and thermometers, (ii) costs resulting from the disinfection and sanitization, and (iii) costs from implementing remote work and other mitigative measures.

43. RGG therefore seeks the following declarations from the court pursuant to Massachusetts General Laws Chapter 231A, confirming:

- The presence or risk of the COVID-19 communicable disease at RGG's covered locations or within five miles of RGG's covered locations is "direct physical loss of or damage" to property.

- The presence or risk of the COVID-19 communicable disease at RGG's covered locations or within five miles of RGG's covered locations entitles RGG at least to the following Time Element coverages in the Policy: (i) lost Gross Earnings or lost Gross Profits, (2) Leasehold Interest, (3) Tenants Prohibited Access, (4) Civil or Military Authority, (5) Ingress/Egress and (6) Extra Expense.

44. Declaratory relief by this Court will terminate some or all of the existing controversy between the parties.

**COUNT II**
**(Declaratory Relief – Inapplicability**
**of Contamination Exclusion)**

45. RGG repeats and realleges the allegations in the preceding paragraphs.

46. The Policy contains many amendatory endorsements that change certain coverages afforded by the Policy. Some are, by their terms, applicable only to risks insured in particular states. *See, e.g.*, "Amendatory Endorsement – Connecticut" ("**THIS ENDORSEMENT APPLIES TO THOSE RISKS IN CONNECTICUT. PLEASE READ IT CAREFULLY**").

47. Other amendatory endorsements use the name of a state in their title but do not limit the applicability of the endorsement to risks insured in the identified state. *See, e.g.*, "Amendatory Endorsement – Alaska" (**"THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY"**).

48. Section 6.21 of the Policy states that "[t]he titles of the various paragraphs and endorsements are solely for reference and *shall not in any way affect the provisions to which they relate*." (Emphasis added).

49. The Policy contains an amendatory endorsement using the title "Louisiana" but, unlike the Connecticut amendatory endorsement noted above, does not limit its reach only to risks insured in Louisiana. Instead, this endorsement is like the Amendatory Endorsement – Alaska noted above (**"THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY"**).

50. This particular endorsement deletes the Policy's definition of "Contamination (Contaminated)" and "Contaminant(s)" and replaces it with the following definitions: "Contamination (Contaminated) - Any condition of property due to the actual presence of any

Contaminant(s) . . . ." It defines "Contaminant(s)" as "Any solid, liquid, gaseous, thermal or other irritant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed), other hazardous substances, Fungus or Spores)."

51. This amendatory endorsement excludes pathogens, viruses, and disease-causing agents from its definition of "Contamination." Consequently, nothing in the Policy excludes coverage for anything even remotely related to a "virus."

52. The "due to" requirements in the contamination exclusion are quite specific. They require a *direct relationship* between an identified contaminant and a resulting loss for the exclusion to bar coverage. This is quite different from the so-called "virus" exclusions that appear in policies written on a standard form published by the Insurance Services Office. Those provisions contain "anti-concurrent causation" verbiage that excludes coverage if a "virus" is a direct or indirect cause of a loss or if a "virus" is one of many causes of a loss. The contamination exclusion in the Policy, however, requires an excluded contaminant to be the *sole* and *immediate* cause of a loss to bar coverage. The direct and immediate cause of RGG's loss is the presence or risk of the COVID-19 communicable disease at property. The definition of "contaminant" in the Policy does not include communicable disease.

53. RGG does not seek coverage from Zurich for "contamination" or any cost "due to contamination." It does not seek coverage for the condition of affected properties – such as the cost to remediate property or losses resulting from the diminution of the value of property – due to the presence or risk of a contaminant on property. Instead, RGG seeks various Time Element coverages due to its lost business income and extra expenses resulting from the presence of the COVID-19 communicable disease at property, and the resulting closures of covered locations.

54. RGG therefore seeks a declaration from the Court pursuant to Massachusetts General Laws Chapter 231A, confirming that the contamination exclusion in the Policy does not bar RGG's claim for Time Element coverages under the Policy.

55. Declaratory relief by this Court will terminate some or all of the existing controversy between the parties.

## COUNT III
### (Declaratory Relief – Inapplicability of Other Exclusions)

56. RGG repeats and realleges the allegations in the preceding paragraphs.

57. Zurich's coverage denial letter identified other exclusions that "may" bar RGG's claim.

58. One of the potentially applicable exclusions is for loss or damages resulting from the enforcement of law, ordinances or regulations. This is not applicable. RGG's loss results from physical loss or damage at property, not the "enforcement" of laws, ordinances or regulations.

59. Zurich's denial letter also raised the possibility that a "loss or market" or "loss of use" exclusion bars RGG's claims. This is incorrect, as well. RGG's claim is due to physical loss or damage at property, not because it merely lost the ability to use its property.

60. RGG therefore seeks a declaration from the Court pursuant to Massachusetts General Laws Chapter 231A, confirming, to the extent pursued by Zurich, neither the enforcement of laws, loss of market, nor loss of use exclusions in the Policy bar RGG's claims.

61. Declaratory relief by this Court will terminate some or all of the existing controversy between the parties.

## COUNT IV
### (Breach of Contract)

62. RGG repeats and realleges the allegations in the preceding paragraphs.

63. RGG has sustained business income and extra expense losses covered under the Policy.

64. Zurich has materially breached the Policy by, among other things, improperly denying coverage for the claim and refusing to pay RGG's business income and extra expense losses that are covered by the Policy.

65. As a direct and proximate result of Zurich's material breaches of contract, RGG has suffered, and is entitled to recover, direct, indirect, consequential and incidental damages in an amount to be determined at trial. RGG also is entitled to all other direct, indirect, consequential, special and compensatory damages as a result of Zurich's breach of contract.

## COUNT V
### (G.L. c. 93A – Unfair and Deceptive Trade Practices)

66. RGG repeats and realleges the allegations in the preceding paragraphs.

67. By the actions alleged herein, Zurich's conduct constitutes unfair and deceptive acts and practices in the conduct of trade or commerce in violation of M.G.L. c. 93A, §§ 2, *et seq.*, and actionable under § 11.

68. Zurich has willfully and knowingly violated, in whole or in part, the provisions of G.L. c. 176D § 3. Such conduct constitutes a *per se* violation of M.G.L. c. 93A.

69. As a direct and proximate result of these unlawful actions, RGG has suffered, and continues to suffer, direct, indirect, consequential and incidental damages. RGG is entitled to treble damages and reasonable attorneys' fees in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, RGG prays for the following relief:

A.      Enter a judgment in its favor memorializing the declarations requested in Counts I through III of this Complaint.

B.      Enter judgment in its favor on Count IV of this Complaint awarding RGG its direct, indirect, consequential and incidental damages, with interest in the maximum amount allowed by law, according to proof at trial;

C.      Enter judgment in its favor on Count V of this Complaint awarding RGG multiple damages and attorneys' fees; and

D.      Enter a judgment awarding RGG its costs of suit incurred, including attorneys' fees, interest, and any other and further relief to which it may be entitled.

**JURY DEMAND**

RGG demands a trial by jury on all issues so triable.

        Respectfully submitted,

        Rue Gilt Group, INC.
        By Its Attorneys,

        /s/ Jeffrey W. Moss

        Jeffrey W. Moss, BBO# 552421
        Wayne E. George, BBO# 656286
        Morgan, Lewis & Bockius LLP
        One Federal Street
        Boston, Massachusetts 02110
        Tel:    617.341.7700
        Fax:    617.341.7701

Dated:  March 11, 2022

DB1/ 128174112.1